No. 93,972

STATE OF KANSAS, *Appellee*, v. CHARLES R. WINSTON, *Appellant*.

(135 P.3d 1072)

Opinion filed June 9, 2006.

*Janine A. Cox*, capital appellate defender, argued the cause and was on the brief for appellant.

*John J. Bryant*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a companion case to *State v. Tatum*, (No. 93,931, this day decided). Chatha Tatum and Charles R. Winston were codefendants and were tried together. Winston appeals his convictions and sentences for first-degree murder, an off-grid crime (K.S.A. 21-3401), and attempted first-degree murder, a severity level 1 person felony (K.S.A. 21-3401; 21-3301). He raises the following points which he claims require that we reverse his convictions: (1) the admission of gang evidence; (2) the denial of his motion for a separate trial from his codefendant; (3) the denial of his motion for mistrial; and (4) the sufficiency of the evidence. K.S.A. 22-3601(b)(1) vests this court with jurisdiction. We conclude that no reversible error occurred and affirm.

## FACTS

### Overview

On December 17, 2003, Damon Walls, his girlfriend Kyea Kimbrough, and his friend Terrell Williams drove to Dwayne Coates' house in Kansas City, Kansas, to purchase marijuana. The buy had been prearranged shortly before. When they arrived at Coates' house, Walls parked the car and Williams got out. As Williams walked up to the house, Walls' car was hit by a barrage of gunfire. Walls and Kimbrough both received multiple gunshot wounds. Walls survived but Kimbrough died.

### The investigation

That evening, Kansas City, Kansas, police officers were investigating a crime scene in the 1700 block of Cleveland when they heard about 20 to 30 gunshots in the next block. At first they ducked for cover, not knowing if the shots were directed at them. They then ran between the houses and saw a van speeding away. Shortly after that, they received a call that there was shooting in the 1500 block of Haskell.

When officers arrived at the scene, they found a large number of shell casings in the street in front of 1532 Haskell, along with a large amount of blood on the curb, a shoe, a Ruger 9 mm handgun, a cell phone, and broken glass. Crime scene technicians recovered 21 spent shell casings of different calibers—.223 caliber, .40 caliber, and .45 caliber.

As additional officers were being dispatched to the scene, another call came in that two shooting victims from the Haskell crime scene were at the fire station about 12 blocks away. At the fire station, officers found a vehicle parked in the driveway. The car had been riddled with bullets and had shattered windows and a flat front tire. Walls was lying on the ground outside the driver's side of the car, and Kimbrough was lying outside the passenger side of the car. Both were being attended to by several firemen or paramedics. Walls had suffered three nonfatal gunshot wounds to his left side and one to his right foot. Kimbrough suffered six gunshot wounds and died.

At the fire station, Walls identified the shooters as "Edie" and "Charlie" and said they were driving a gray Chevy minivan. The investigation alerted the police to suspect that "Edie" was Chatha Tatum. The next day, when Walls was shown a photographic lineup that included Tatum's photograph, he immediately identified Tatum as one of the shooters.

Walls told a detective that he thought "Charlie" was Charlie Allen, that he had a brother named Terry Allen, and that his nickname was "Nose." When Walls was shown a lineup containing a photograph of an individual named Charlie Allen, Walls was adamant that the Charlie who was involved in the shooting was not in that lineup. The detective contacted the Kansas City, Missouri, Police Department's intelligence unit and learned that a man named Charles Winston associated with Tatum and had a brother named Terry Allen. When Walls was shown a photographic lineup containing Winston's picture, he identified him immediately.

Williams was questioned the night of the shooting, but he initially lied about his presence at the scene, telling the police he was just an innocent bystander. However, the next day he admitted he went to Coates' house with Walls and Kimbrough and saw the

shooting. He told officers he saw a man he knew as Edie shooting at Walls' car.

Walls' and Williams' versions of the events that night differed somewhat, so they are set out separately below.

### Damon Walls' testimony

When they arrived at Coates' house, Walls noticed a dark-colored minivan parked across the street and another car in front of the van. Walls noticed from the exhaust that the vehicles were running. Williams got out of the car, Fat Mac (involved in arranging the marijuana purchase) got out of the car parked in front of them, and they walked up toward the house. Walls then received a call on his cell phone from Williams, who said, "[H]ey, Bro, that's the dudes from the mall." That remark referred to an incident at Oak Park Mall earlier that summer where Winston and Tatum had threatened Walls. That incident will be discussed in detail below.

Walls then saw Winston get out of the van and saw Tatum get out of one of the cars parked nearby. He knew Tatum and Winston from the incident at Oak Park Mall, and he had played basketball with Winston at the local community center when he was younger. He saw that Winston had a gun, and Winston pointed it at Walls' car in a gesture that appeared to be intended to let Tatum know that Walls was in that car. Walls tried to slide down into the seat, and then the shooting started. He saw Winston shooting from the front of the van and saw Tatum shooting from the side of the van.

Kimbrough was in the passenger seat, and Walls leaned over and tried to push her out of the car, but she had her seat belt on. He climbed out of the car through the passenger side window, and as he did, he was shot in the foot. The shooting stopped about that time. He opened the passenger door as he lay on the ground and then undid Kimbrough's seatbelt. He heard the van drive off fast. Williams came over to the car, helped Walls get into the back seat, and drove him and Kimbrough to the fire station.

At trial, Walls identified Winston and Tatum as the shooters.

### Terrell Williams' testimony

When they arrived at Coates' house, Williams saw a maroon van parked across the street. There were three to four people in the van. As he walked up to the house, he heard someone in the van asking, "[I]s that him, is that him?" He tried to call Walls on his cell phone to ask him if they were the guys from the mall, but he said he did not get hold of Walls.

Williams then saw Tatum get out of the van, and the shooting started. He dove onto the porch and lay there. He looked through the porch rails and saw two people shooting. However, the only one he saw get out of the van was Tatum. He recognized Tatum from the incident at Oak Park Mall. After the shooting stopped, he jumped off of the porch and began to run when he heard Walls yelling for him. He went over to the car, helped Walls into the car, and drove Walls and Kimbrough to the fire station.

At trial Williams identified Tatum as the shooter he saw that night.

### The Oak Park Mall incident

During the summer before the shooting, Walls, Williams, and Marcus Harris were at Oak Park Mall. Williams saw a group of three guys staring at them. Walls recognized two of the three as Tatum and Winston. A few minutes later, the group approached them and Tatum told Walls he looked like someone Tatum had "popped." Williams recalled that Tatum said, "We killed a nigga looked just like you, we gonna get you too." After Tatum's comment, Winston told Walls that Walls' little brother was going to have to get Walls' name tattooed on his neck next. Walls knew the comment concerned his older brother "Messy Marvin," who had been shot and killed 2 years earlier. Walls had had his brother's name tattooed on his neck after Marvin was killed. Harris took the comment to mean that they wanted Walls dead just like his brother.

Williams then asked what was going on, and Tatum said they had a problem with Walls, they did not like him, and Walls knew what was going on. Williams asked Tatum and Winston who they were, and Tatum said he, indicating Walls, knew who they were.

Tatum did not actually display a gun that day; however, they all believed that he had one. Williams testified that during the confrontation, Tatum "stressed" that he had a gun. Tatum said, "I'm ready, we can do whatever" and indicated to them he had a gun by the way he had placed his hand and from the "gun print" he saw in Tatum's pocket. Harris saw Tatum tap on a bulge on his hip that looked like a gun.

Although the incident was serious, and he was scared, Walls just "laughed it off" because he did not have a gun with him. After they left the mall, Walls called his grandmother and told her about the incident. He was very upset.

At trial, Walls, Williams, and Harris each identified Winston and Tatum as the men at the mall.

### Gang evidence

The State's theory of the case was that the shooting was gang related in that it arose out of an ongoing conflict between two rival Kansas City, Missouri, gangs. Victim Walls was from Kansas City, Missouri, as were the defendants.

The State filed a motion prior to trial to introduce evidence of gang membership to provide the motive for the shooting and to explain the Oak Park Mall incident. Winston filed a motion to exclude evidence that he was in a gang or associated with a gang.

At a pretrial hearing, the State presented testimony from Kansas City, Missouri, Homicide Detective Everett Babcock. Detective Babcock had been involved in investigating numerous gang-related homicides, including many arising out of the longstanding feud between Hilltop and Tre Wall. One of the homicides believed to be part of that feud was the murder of Walls' older brother, "Messy Marvin." He testified that Marvin Walls had been associated with Tre Wall, and all of the suspects in that homicide are Hilltop associates. He testified that Damon Walls goes by the nickname "Little Messy" and associates with members of Tre Wall.

Detective Babcock testified that both Winston and Tatum are affiliated with the Hilltop gang. He explained that his opinion was based on a number of factors commonly used in determining gang affiliation, which include claiming membership, wearing gang col-

ors, having gang tattoos, associating with known gang members, hanging around a gang area, and repeatedly taking part in criminal acts with others associated with the gang. Additionally, gang affiliation is based on intelligence about gang affiliations received during interviews.

Detective Babcock testified that he based his opinion that Winston was an associate of Hilltop on the fact he was frequently in the company of Hilltop gang members in the Hilltop gang's known area and is believed to have participated in criminal activity with them. His information about Winston's criminal activity includes Winston's involvement in committing aggravated assaults with Tatum, as well as information from intelligence linking him to drug deals and assaults involving Hilltop associates. Additionally, Winston and Tatum were found together when they were arrested for this crime, and they were both in possession of narcotics with intent to distribute and possession of weapons—crimes for which they were both charged.

Detective Babcock testified that he has similar information concerning Tatum—frequent association with Hilltop gang members, the fact he hangs out with them in the Hilltop area, and the fact he is known to have participated in crimes with them. Additionally, he testified that Tatum has a gang tattoo—a "Duce Tre" tattoo representing the 23rd Street border of the Hilltop gang area.

The State also proffered that it had photographs that were found on Tatum's cell phone showing Winston with Tatum and other gang members who were flashing gang signs and had weapons in their hands. Detective Babcock testified about the pictures. The pictures were not admitted at trial.

On cross-examination, Detective Babcock admitted that Winston did not have all of the gang indicators: Detective Babcock did not know if Winston had any gang tattoos, had never heard Winston claim a gang, and could not recall if he had seen Winston wearing gang colors. When pressed about whether Winston was a gang member, he explained that he considered him a gang associate and avoided the term "gang member":

"These people aren't carrying membership cards. You cannot say that this person's a member of a gang, pull out a roster and show it. They associate with other

people that are affiliated or are in a certain area, hang to that certain area and take part in criminal acts in that certain area. If they associate with them and take part in crimes with them, then I would consider them more of a gang associate. I don't like the term 'gang member,' I never have."

Detective Babcock also testified that the circumstances surrounding the shooting in this case were similar to what he typically sees in Kansas City, Missouri, gang-related homicides—the large number of shots fired, as well as the drive-by ambush style.

After the hearing, Winston argued that the detective's testimony, without more, was too weak to prove that Winston was a gang member. The State informed the court that it intended to offer additional evidence of gang affiliation and conduct through the victim, Damon Walls. The State proffered that Walls would testify that Winston and Tatum both claimed to be Hilltop associates and would connect the defendant's gang affiliation and activity to the crimes charged through evidence about the Oak Park Mall incident and the connection to Walls' brother's gang affiliation and murder.

The trial court accepted the State's proffer and ruled that based on the evidence heard and the State's proffer, the State had established that the gang evidence was relevant to show a motive for what would otherwise be an inexplicable act.

At trial, the State presented gang evidence through Walls, Walls' grandmother, George Anna Myers, and Detective Babcock.

Walls believed the reason Tatum and Winston tried to kill him that night was because of the gang-related murder of his brother almost 2 years earlier. Walls' brother Marvin had been a member of the Kansas City, Missouri, gang called Tre Wall, also known as Third Wall and Tre Tre. Marvin had a Tre Wall tattoo. Tre Wall was in a longstanding feud with a rival Kansas City, Missouri, gang called Hilltop.

Walls testified that Tatum and Winston "claimed" Hilltop. He knew Tatum was a Hilltop member from things he had overheard from his brother. Walls testified that although he personally did not have any problem with Hilltop, his brother's conflict with Hilltop became his problem too, because that is the way things work with the Kansas City gangs. If gang members have a problem with someone they also have a problem with that person's little brother.

While Walls denied that he was involved in a gang, he admitted that he has friends who are Tre Wall members.

Myers testified that Marvin became involved in a "beef" over some tennis shoes with Terrence Diamond and his associate, defendant Tatum. Diamond was a member of Hilltop's affiliate the 51st Street gang, and Tatum was with Hilltop. According to Walls, Diamond and Tatum were very close friends. Eventually, the conflict escalated, and Marvin shot at Diamond and other Hilltop gang members. Marvin had told Myers he had to shoot at them because the situation had come to the point where they were going to kill him. Both Walls and Myers believe Marvin was killed by Diamond. Additionally, Myers testified that Coates was supplying marijuana to gang members from Hilltop.

Detective Babcock testified at the trial; however, it is important to note that his trial testimony concerning gang affiliation was more limited than his testimony during the pretrial hearing. At the pretrial hearing, Detective Babcock testified that engaging in criminal activities is one of the indicators he considers in determining whether someone is a gang associate. Further, he testified he based his opinion that Winston was associated with Hilltop in part on the fact that Winston was believed to have engaged in other criminal activities with Tatum and other Hilltop associates. Defense counsel filed a motion to exclude that evidence at trial. The State agreed not to elicit that evidence during trial, and the trial court agreed that evidence should not be introduced.

Detective Babcock testified that indicators that someone is associated with a gang include claiming membership, having gang-related tattoos, and wearing gang colors. He testified that Hilltop members are likely to identify themselves with tattoos of their block, such as 23rd Street. Because Hilltop is considered a Crips set, they often wear blue. Tre Wall is considered a Bloods set, and they often wear red.

Detective Babcock testified that he first heard of "Edie" about 3 years ago, and the name was associated with Hilltop. Since then, he had determined that "Edie" was Chatha Tatum, the codefendant. He testified that Tatum is affiliated with Hilltop and that

Tatum has a tattoo depicting a street sign with the numbers "Duce" and "Tre" indicating his affiliation with Hilltop.

Detective Babcock testified that Winston, whose nicknames are "Nose" and "Little Charlie," is associated with Hilltop. He testified that Tatum and Winston associated together and were friends, and that Tatum was also friends with Winston's brother, Terry Allen, who is a Hilltop member. He also testified that Walls' brother, Marvin, was a Tre Wall member and had been involved in a conflict with Terrence Diamond, a Hilltop affiliate.

When asked about whether Winston had any gang affiliation indicators, Detective Babcock testified he was not aware of Winston having any tattoos, but he had seen him wearing blue, although he admitted that fact, by itself, does not mean a lot. He also admitted that he was not aware of Winston ever claiming a gang representation.

Detective Babcock also testified that gang-related homicides are typically an ambush-style attack with multiple rounds, and the witnesses in those cases tend to be uncooperative.

The defense called no witnesses. The jury found Winston guilty of one count of first-degree murder and one count of attempted first-degree murder. Winston was sentenced to life imprisonment on the first-degree murder conviction and a consecutive sentence of 165 months' imprisonment, the aggravated sentence in the grid box, on the attempted murder conviction.

## DISCUSSION

### The Admission of Gang Evidence

Winston argues the trial court erred in admitting evidence concerning gang membership and gang activity.

"The first step in determining if evidence is admissible is to determine whether the evidence is relevant. Unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. Because relevancy is a matter of logic and experience, the determination of relevancy is generally seen as inherently discretionary. A trial court's discretion must be guided by the considerations imposed by prior case law and by the rules of evidence." *State v. Goodson*, (No. 92,662, this day decided), Syl. ¶ 6.

"Relevant evidence means evidence having any tendency in reason to prove any material fact. Materiality requires that the fact proved be significant under the substantive law of the case and properly at issue. While an [evidentiary] fact may be relevant under the rules of logic, it is not material unless it has a legitimate and effective bearing on the decision of the ultimate facts in issue." *Goodson*, Syl. ¶ 7.

Evidence that a defendant is a gang affiliate or is associated with gang-related activity "may be relevant when the evidence provides a motive for an otherwise inexplicable act, forms a part of the events surrounding the commission of the crime, or shows witness bias." *Goodson*, Syl. ¶ 8. "For evidence of gang affiliation to be admissible there must be sufficient proof that gang membership or activity is related to the crime charged." *Goodson*, Syl. ¶ 9.

Winston argues that the trial court abused its discretion in admitting gang evidence because the State failed to sufficiently prove that he was a gang member and that the crimes charged were related to gang activity. The State contends this issue was not properly preserved for appeal because Winston failed to make a contemporaneous objection to the admission of testimony at trial that he was affiliated with a gang.

Although the defendant raised this issue through a pretrial motion in limine, a contemporaneous objection at trial to the evidence was still required in order to preserve the issue for appeal. See *State v. Sims*, 265 Kan. 166, 176, 960 P.2d 1271 (1998) (issue of the admissibility of evidence of gang affiliation not preserved where there was no timely objection to the evidence when it was presented at trial); *State v. Bailey*, 251 Kan. 156, 166, 834 P.2d 342 (1992), *modified on other grounds State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993) (although issue of admissibility of gang membership was raised in a motion in limine, it is not preserved for appeal where the evidence of gang membership was admitted without objection).

The admissibility of the evidence could also have been preserved by a request for a continuing objection. " 'If a continuing objection is lodged, failure to object when the evidence is subsequently re-admitted does not bar raising the issue on appeal.' " *State v. Bran-*

*ning,* 271 Kan. 877, 880, 26 P.3d 673 (2001) (quoting *McKissick v. Frye,* 255 Kan. 566, 582, 876 P.2d 1371 [1994]).

Although counsel did not make repeated contemporaneous objections each time gang evidence came up, nor did he specifically request a "continuing objection," the objections that were made were obvious attempts to renew the pretrial gang evidence objection and, therefore, should be considered sufficient to preserve the issue for review. See *State v. Haddock,* 257 Kan. 964, 979, 897 P.2d 152 (1995), *overruled on other grounds State v. James,* 276 Kan. 737, 79 P.3d 169 (2003) (K.S.A. 60-455 issue preserved for appeal where defendant *renewed* his earlier objections to such evidence at trial); *State v. Alford,* 257 Kan. 830, 840, 896 P.2d 1059 (1995) (issue not preserved for appeal where the defendant's pretrial objection to the evidence was not *renewed*).

The overall purpose of the contemporaneous objection rule was served in this case. The objections related back to the pretrial motion and were sufficient to give the court an opportunity to change its mind on the admissibility of gang evidence. See *State v. Parker,* 277 Kan. 838, 845, 89 P.3d 622 (2004) ("[T]he rationale underlying the contemporaneous objection rule is to permit the trial court to avert error by precluding improper evidence. [Citation omitted.]").

Winston argues that gang evidence was not admissible because the State failed to sufficiently prove that he was a gang member and that the crime was gang-related, citing *Tran,* 252 Kan. 494, Syl. ¶ 6 (Gang evidence relevant to show a motive for an otherwise inexplicable act "is only admissible where there is sufficient proof that such membership or activity is related to the crime charged.").

The defendant contends the State failed to meet this foundational threshold because it did not provide any "convincing evidence" that he was a gang member, nor was there any evidence the crime was gang related. He contends that Detective Babcock's testimony that Winston was an associate of the Hilltop gang was not supported by "anything of substance" because he did not have gang tattoos and had not declared any gang affiliation. He argues that Detective Babcock's testimony only established, at most, that he associated with known gang member Tatum.

The State asserts that the defendant's factual argument is flawed because it mentions only Detective Babcock's trial testimony. The State argues the defendant ignores the fact that the trial court's ruling on the admissibility of gang evidence was based on the more extensive evidence presented at the pretrial hearing, which showed that Detective Babcock's opinion that Winston was associated with Hilltop was based on an additional gang affiliation indicator—not admitted at trial—that he participated in criminal activities with Hilltop associates. The State also contends the defendant's argument ignores the evidence from Walls that both codefendants belonged to Hilltop and other testimony on the connection between Hilltop, these defendants, and the shooting.

The defendant did not file a reply brief or otherwise provide any explanation or argument to justify relying only on Detective Babcock's trial testimony in arguing there was insufficient evidence that Winston was affiliated with a gang.

The trial court in this case made a pretrial determination that gang evidence was admissible based, in part, on evidence that was not presented to the jury because it concerned evidence of other crimes under K.S.A. 60-455. The defendant ignores that evidence in its argument to the court on appeal that there was not a sufficient foundation justifying the admission of gang evidence, while the State takes issue with the omission and directs the court to that evidence.

The defendant relies on *State v. Pham*, 27 Kan. App. 2d 996, 10 P.3d 780 (2000), as a case in which the admission of gang evidence was found to be an abuse of discretion. Although not cited by the defendant, *State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995), is also a relevant case on the issue of the sufficiency of predicate proof of gang affiliation necessary for the admission of gang evidence.

In *Cox*, the defendant and four other young people encountered the victim Marcus Smith, surrounded his car, ordered him out and onto the ground at gunpoint, got into his car, and then shot him as they sped away.

Cox and three of the four others were tried jointly. The State's theory was that the carjacking was gang activity. The State's only evidence that Cox was a gang member was Cox's statement that

he belonged to three rap groups, and the testimony of a gang expert that gang members sometimes say they belong to rap groups. Additionally, there was no evidence any of the other defendants who were part of the group that night were gang members, nor any evidence suggesting that the motive for the crime was gang related.

The court held the trial court abused its discretion in admitting gang evidence:

"While there was evidence suggesting that the defendants and Kilo were acting in concert, there was no evidence suggesting either gang involvement or gang motivation. The fact that there was evidence suggesting a conspiracy between young people to commit a crime does not make expert testimony regarding gangs relevant. The logic used to find relevancy is flawed. The State through the testimony of its gang expert advanced the premise that a person who belongs to a rap group is a member of a gang: Cox belongs to a rap group; therefore, Cox, the other three defendants, and Kilo are members of a gang." *Cox*, 258 Kan. at 565.

In *Pham*, the Court of Appeals held that the trial court abused its discretion in admitting evidence that the defendant and his companions had gang nicknames because:

"there was no predicate proof that this crime was in any way gang-related, much less that Pham's gang membership or activity supplied a motive for an otherwise inexplicable act. [Citation omitted.] . . . In these circumstances, the evidence of gang names had zero probative value." 27 Kan. App. 2d at 1002.

This case differs substantially from *Cox*, where the only evidence that the defendant was a gang member was based on a faulty inference. In this case, there was evidence that Winston and his codefendant were affiliated with a gang.

The defendant's argument that the evidence he was associated with a gang was not based on "convincing evidence" because he did not have some of the gang affiliation indicators such as tattoos, claiming membership, or wearing gang colors, goes to the weight of the evidence rather than its admissibility. See 29 Am. Jur. 2d, Evidence § 309, p. 323 ("Matters tending to reduce or enhance the apparent probative value of evidence affect only the weight of such evidence and not its admissibility."). *Cf. State v. Dykes*, 252 Kan. 556, 562, 847 P.2d 1214 (1993) (challenge to the reliability of DNA testimony based on population studies statistics goes to its weight, not its admissibility); *State v. Weigel*, 228 Kan. 194, 199,

612 P.2d 636 (1980) (completeness of the witness' identification of the accused's voice goes to the weight of the evidence and not its admissibility); *State v. Miesbauer*, 3 Kan. App. 2d 53, 55, 588 P.2d 953 (1979) (witnesses' inability to distinguish between behavior caused by intoxication and behavior caused by injuries received in the accident goes to the weight of the evidence of the defendant's behavior and not to its admissibility).

Further, in contrast to both *Cox* and *Pham*, there was abundant evidence suggesting the motivation for this crime was gang related. At Oak Park Mall, Winston and Tatum, acting together, referenced the prior gang-related murder of Walls' brother "Messy Marvin" and made a veiled threat that Walls would soon be facing the same fate. Then, just several months later, Walls was shot at in a gang-style ambush attack, and the shooters were identified as Winston and Tatum.

The mall incident was pivotal, as it supported the identity evidence, provided evidence of motive, and made the gang-related circumstances surrounding Marvin's murder relevant to provide the necessary context to the threats. To understand the full import of what the codefendants had indicated to Walls at the mall and why they would make such threats to Walls, it was necessary to understand the circumstances behind the gang-related murder of Walls' brother and how the dispute that underlay that killing could expand to become a threat to Walls. Thus, the Oak Park Mall incident suggested the gang-related motivation for the crime, rendering the gang evidence relevant.

In summary, the defendant fails to carry his burden to show the trial court abused its discretion in admitting the gang evidence in this case. Sufficient predicate proof was shown that both Winston and Tatum were associated with the Hilltop gang and that their gang affiliation and activity was related to the crime charged.

### The Denial of Defendant's Motion for a Separate Trial

Prior to trial, Winston requested severance from codefendant Tatum under K.S.A. 22-3204. He argued that he would be prejudiced by evidence admissible against codefendant Tatum that would not be admissible against him if he were tried separately.

The trial court denied the motion, finding that none of the bases for granting severance were shown to exist, and further, that any prejudice would be cured by instructing the jury that each defendant must be judged solely on the evidence admissible as to that particular defendant. Winston renewed his arguments in his motion for new trial, which was denied.

Severance of jointly charged codefendants is governed by K.S.A. 22-3204, which states:

"When two or more defendants are jointly charged with any crime, the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney."

"Severance lies within the sound discretion of the trial court, and should occur when a defendant has established there would be actual prejudice if a joint trial occurred." *State v. White*, 275 Kan. 580, 589, 67 P.3d 138 (2003) (citing *State v. Butler*, 257 Kan. 1043, 1062, 897 P.2d 1007 [1995], *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 [1996]); *State v. Hunter*, 241 Kan. 629, 633, 740 P.2d 559 (1987). A trial court's denial of severance will be reversed only when a clear abuse of discretion is shown. *State v. Davis*, 277 Kan. 231, 239, 83 P.3d 182 (2004.) The party claiming error in the denial of severance "has the burden to establish the claim and must establish that there was clearly an abuse of discretion." *White*, 275 Kan. at 589.

It must be noted that the defendant argues that the severance statute, K.S.A. 22-3204, states that "severance should be granted when it appears necessary to avoid prejudice and insure a fair trial." That language is not in the statute, but, rather, is found in *Davis*, 277 Kan. at 239, where this court said: "When applying K.S.A. 22-3204, this court has stated that severance should be granted when it appears necessary to avoid prejudice and ensure a fair trial to each defendant. [Citation omitted.]"

Although the defendant cites the correct standard of review, he relies on the *Davis* language to argue that it is not necessary to show with absolute certainty that prejudice will occur, implying that the standard for severance is the mere possibility of prejudice. This is contrary to the well-recognized requirement that severance

requires a showing that *actual prejudice* will result. See *State v. Aikins*, 261 Kan. 346, 360, 932 P.2d 408 (1997).

The factors to be considered in determining whether there is sufficient prejudice to mandate severance are:

" ' "(1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants." ' " *Butler*, 257 Kan. at 1063 (quoting *State v. Martin*, 234 Kan. 548, 549, 673 P.2d 104 [1984] [quoting 75 Am. Jur. 2d, Trial § 20]).

See *Davis*, 277 Kan. at 240.

Winston's argument on appeal is based solely on the third factor. He argues that gang evidence would not have been admissible if he had been tried separately because, unlike Tatum, he was not specifically identified as a gang member.

With respect to the gang affiliation evidence, the State contends that if the gang evidence is held to have been properly admitted, then Winston's argument on this point fails.

The defendant's argument that gang evidence would not have been admissible against him in a separate trial is based on the contention that he was not identified as a gang member. His argument is without merit. First, Detective Babcock testified Winston was associated with the Hilltop gang, and contrary to the defendant's argument, in this case, there is no meaningful distinction between gang "members" and gang "associates." As the detective's testimony at the pretrial hearing made clear, his use of the term gang "associate" equates to the term gang "member" because it more accurately reflects the relationship than the term "member," given that gangs do not have membership rosters, nor do people who associate with gangs carry membership cards.

Second, Detective Babcock's testimony and Walls' testimony established that Winston was affiliated with Hilltop. Third, Winston's argument ignores the fact that it was the statements made by Win-

ston and Tatum, acting in concert at the mall, that provided the gang-related motive for this crime, and opened the door to evidence about the Hilltop-Tre Wall feud and Messy Marvin's murder. Thus, as discussed above, the gang evidence was properly admitted against Winston and would have been admissible even if he had been tried separately.

The defendant also contends that evidence of Tatum's inculpatory statements made after Tatum was arrested was prejudicial to him and would not have been admitted at a separate trial. Officer Hernandez testified that while Tatum was in a holding cell after his arrest, he yelled, "snitches get snitches and they got no witnesses, I leave no witnesses," and something to the effect as to how he was going to beat a case in Wyandotte County.

The defendant is correct that Tatum's statements would not be admissible against him if he were tried separately. The next question then is whether the admission of the statements caused actual prejudice to Winston.

Before the evidence of Tatum's statements was presented, the trial judge instructed the jury that the evidence applied only to codefendant Tatum: "It's my understanding that what Officer Hernandez is going to testify to doesn't have anything to do with Mr. Winston, and so you just simply need to be aware that this is evidence that applies apparently to Mr. Tatum only." The jury instructions also included PIK Crim. 3d 52.07, instructing the jury to give separate consideration to each defendant and that any evidence limited to one defendant should not be considered as to the other.

This court has held that such a limiting instruction is sufficient to minimize any prejudice to codefendants. See *State v. Smith*, 268 Kan. 222, 235, 993 P.2d 1213 (1999) (no prejudice from refusal to sever where trial court instructed jury before evidence of co-defendant's prior bad acts, that such evidence was admissible only as to that defendant); *State v. Falke*, 237 Kan. 668, 677, 703 P.2d 1362 (1985), *disapproved of on other grounds State v. Walker*, 252 Kan. 279, 845 P.2d 1 (1993).

In summary, Winston has not shown that the trial court's refusal to sever the cases resulted in actual prejudice. The gang evidence would have been admissible against Winston even if he were tried

separately, and the jury was instructed that Tatum's inculpatory statements were admitted only against Tatum. Thus, the defendant has not shown the trial court abused its discretion in refusing to sever the codefendants' trials.

### Denial of Defendant's Motion for Mistrial

The defendant frames this issue as: "The trial court committed reversible error when it denied Mr. Winston's motion for mistrial based on evidence of rumored criminal activity, which was admitted in violation of K.S.A. 60-455." However, he fails to identify in the record where a request for mistrial was made, he does not argue the standard of review applicable to review of a denial of a motion for mistrial, and he does not argue the trial court erred in refusing to grant a mistrial. A review of the defendant's argument reveals that the issue does not concern a motion for mistrial, but rather, is a reiteration of the argument about the admission of gang evidence. The defendant argues that because there was no evidence he was a gang "member," all of the gang evidence was evidence of other crimes or civil wrongs admitted in violation of K.S.A. 60-455.

The way this issue was presented caused the State to construe the argument as directed at testimony by Detective Babcock in which he said that he first encountered Tatum's nickname when he was assigned to his first homicide case. Counsel objected to that testimony, arguing that "this is exactly the type of so-called gang evidence that is so illegal in my opinion that violates 60-455 . . . ." Thus, the State's argument on this issue is that the testimony did not violate K.S.A. 60-455.

Although the defendant mentions that incident in his discussion of this issue, he appears to do so for the purpose of showing a contemporaneous objection to the gang evidence on the basis of K.S.A. 60-455. The defendant's substantive argument on this issue does not appear to concern that testimony but is more generally directed at the admissibility of all of the gang evidence.

Because the point concerning a mistrial was raised only as an issue, but was not argued in the brief, his issue concerning mistrial has been abandoned. See *State v. Mattox*, 280 Kan. 473, 492, 124

P.3d 6 (2005) (citing *McGinley v. Bank of America*, 279 Kan. 426, Syl. ¶ 4, 109 P.3d 1146 (2005) ("A point raised only incidentally in a party's brief but not argued in the brief is deemed abandoned.").

However, counsel for the defendant during oral argument asserted that a mistrial should have been granted by the trial court. Three requests for mistrial were made during the trial. The first was initiated by Tatum's counsel and was based on news reports about gang activity in Kansas City, Missouri. Winston's counsel joined in the motion, which was denied.

The second came after Winston's counsel objected when Detective Babcock was asked if there were any specific characteristics common to the homicides between Hilltop and Tre Wall. Winston's counsel argued that evidence about "some gang war in Missouri" was beyond the court's ruling. Tatum's counsel joined the objection and renewed the prior request for a mistrial, arguing that with so many gang wars occurring in the metropolitan area her client could not get a fair trial. Winston's counsel joined in the renewed request for a mistrial, and it was denied.

The third motion came after Detective Babcock began to testify that Tatum told him he had sold drugs in the past but stopped after he witnessed a homicide in 2000. Tatum's counsel claimed that evidence he had sold drugs violated K.S.A. 60-455, and Winston's counsel claimed that evidence that he had witnessed a homicide also violated 60-455. The objection was sustained, but Tatum's counsel moved for a mistrial because the jury heard that Tatum admitted to selling drugs. The request was denied. However, the court ordered the jury to disregard the detective's statement that Tatum had sold drugs in the past.

Rather than involving the denial of defendant's motion for mistrial, the defendant's issue in his brief as well as in oral argument concerns the admission of gang evidence; therefore, as stated above our standard of review is abuse of discretion.

The defendant acknowledges that this court has held that evidence of gang membership is not evidence of a prior crime or civil wrong under K.S.A. 60-455. *State v. Lowe*, 276 Kan. 957, 963, 80 P.3d 1156 (2003); *State v. Jamison*, 269 Kan. 564, 568, 7 P.3d 1204 (2000). From that language, he argues there must be evidence of

gang "membership." Evidence that a person merely associates with gang members falls short and would, therefore, be evidence of a crime or civil wrong under K.S.A. 60-455. Winston argues that because "no one testified that Mr. Winston was a "member" of a gang, the gang evidence in this case became evidence of a crime or civil wrong under K.S.A. 60-455 and was, therefore, inadmissible.

The defendant's argument fails for two reasons. First, as discussed above, the defendant's attempt to differentiate a gang "member" from gang "associate" or gang "affiliate" is not supported by the evidence in this case. While no one used the term gang "member" to describe Winston's association with Hilltop, the testimony about his affiliation was the equivalent. Second, evidence of gang membership is not K.S.A. 60-455 evidence because membership in a gang, standing alone, is not a crime or civil wrong. *State v. Bailey*, 251 Kan. 156, 166, 834 P.2d 342 (1992). The same rationale would apply to evidence of gang association or affiliation and defendant's attempted distinction has no legal significance. Evidence of gang affiliation is the same thing as gang membership for purposes of admissibility of gang evidence. In *Lowe*, this court held that "[e]vidence of gang *affiliation* indicating a defendant is a member of a gang or is involved in gang-related activity is admissible to show a motive for an otherwise inexplicable act or to show witness bias. [Citation omitted.]" (Emphasis added.) 276 Kan. at 961. Under *State v. Goodson*, (No. 92,662, this day decided), Syl. ¶ 8, such gang-related evidence is also admissible to show it forms a part of the events surrounding the commission of the crime charged.

### Sufficiency of the Evidence

The defendant contends the evidence was insufficient to support his convictions. The standard of review applied to a challenge to the sufficiency of the evidence is well known:

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard is whether, after a review of all the evidence, viewed in a light most favorable to the prosecution, the court is convinced that a rational factfinder could have

found the defendant guilty beyond a reasonable doubt.' [Citations omitted.]" *Lowe*, 276 Kan. at 965.

Winston contends the evidence against him was insufficient to support his convictions. He argues the only evidence placing him at the scene was Walls' testimony, which was questionable because Walls' ability to see the shooters clearly was hampered by poor lighting and the fact that Walls was trying to get himself and Kimbrough out of the car. Moreover, he contends that Williams testified that Winston was not at the scene at the time of the shooting. However, Williams' testimony was that he did not *see* Winston there, which is not the same thing as an affirmative statement that Winston was *not* there. His testimony was that he saw two people shooting but he did not get to see the other person's face. The only one he could identify was Tatum.

The defendant also points to inconsistencies between Walls' and Williams' testimony about the details of the events, including the fact that while Walls testified Williams called him on his cell phone and warned him that the guys from the mall were in the van, Williams testified that call never went through. He argues that the lack of physical evidence and Walls' questionable testimony, combined with the gang evidence that applied only to Tatum, who was identified as a shooter, resulted in a verdict of guilty on nothing more than his association with Tatum.

The State argues there was sufficient evidence to convince a rational factfinder of Winston's guilt beyond a reasonable doubt. The State points to the fact that Walls identified both shooters by name immediately after the shooting and in photographic lineups, the fact that Walls knew both from the mall incident, and the fact he knew Winston from playing basketball at the community center when he was younger. The State also argues the evidence about the threats Winston and Tatum made to Walls at the mall further supported the evidence against Winston.

Winton's arguments are based on challenges to the credibility of Walls' testimony and inconsistencies in the evidence. In considering a challenge to the sufficiency of the evidence, this court does not pass upon the credibility of witnesses or weigh conflicting ev-

idence. Instead, all questions of credibility are resolved in favor of the State. *Lowe*, 276 Kan. at 965.

The evidence at trial established that Walls and Kimbrough were the victims of an ambush-style shooting. Walls survived, and immediately identified the shooters as "Edie" and "Charlie." He knew Winston from playing basketball at the community center when he was younger, and he also recognized both men from an incident at the mall that summer in which they had made threats to him.

Those threats referenced the prior gang-related murder of his brother and hinted Walls was going to meet the same fate. The evidence showed that both Winston and Tatum were associated with the Hilltop gang and that Walls' brother had been a member of Hilltop's rival, Tre Wall. The murder of Walls' brother was the result of an ongoing feud between the two gangs, and more specifically, a "beef" between Walls' brother and Hilltop associates Tatum and Diamond. Although Walls testified he was not a member of Tre Wall and did not have a problem with Hilltop, he explained that if a gang has a problem with someone, they also have a problem with that person's brother. The truth of that statement was supported by Winston's and Tatum's threats to Walls at the mall. The evidence further established that, just several months after those threats, Walls was indeed faced with the same fate as his brother. Viewing the evidence in the light most favorable to the State as we are required to do, we are convinced that a rational factfinder could have found the defendant guilty on both charges beyond a reasonable doubt.

Affirmed.